UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS

UNITED STATES OF AMERICA,        )
                                 )
                 Plaintiff,      )
                                 )
v.                               )   No. 4:13CR391-JAR
                                 )
WALTER COMBS,                    )
                                 )
                 Defendant.      )

EVIDENTIARY HEARING

BEFORE THE HONORABLE TERRY I. ADELMAN
UNITED STATES MAGISTRATE JUDGE

AUGUST 15, 2014

APPEARANCES:

For Plaintiff:     Patrick T. Judge, Sr.
                   OFFICE OF U.S. ATTORNEY
                   111 S. Tenth Street
                   St. Louis, MO 63102

For Defendant:     Stephen R. Welby
                   WELBY LAW FIRM
                   1221 Locust Street, Ste. 407
                   St. Louis, MO 63103

TRANSCRIBED FROM DIGITAL SOUND RECORDING BY:

                        PATTI DUNN WECKE, RMR, CRR, CMRS
                        Official Court Reporter
                        United States District Court
                        111 S. Tenth Street
                        St. Louis, MO 63102
                        314-244-7984

1

2          (THE FOLLOWING PROCEEDINGS WERE HAD ON AUGUST 15,

3    2014, IN OPEN COURT, AND WITH DEFENDANT PRESENT:)

4          THE COURT:  Okay.  We're here today for the

5    motion hearings in the case of United States versus Walter

6    Combs.  Record will show Mr. Combs is here in person with

7    his attorney Mr. Stephen Welby.  The Government is here

8    represented by Mr. Patrick Judge, who is an Assistant

9    United States Attorney.

10          Mr. Welby and Mr. Judge, my understanding is the

11   only motion pending is the suppression motion; is that

12   right, Mr. Welby?

13          MR. WELBY:  I guess technically, Your Honor.  I

14   filed a motion for leave to withdraw the motion to sever.

15   I assume that will be granted?

16          THE COURT:  That will be granted obviously.

17          MR. WELBY:  Thank you, Your Honor.  Nothing

18   further.

19          THE COURT:  Then we will go ahead then with the

20   motion to suppress.  Mr. Judge, you may proceed.

21          MR. JUDGE:  Judge, we call Lieutenant Neal.

22          THE COURT:  Okay.

23

24                    EUGENE NEAL,

25   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

FOLLOWS:

DIRECT EXAMINATION

BY MR. JUDGE:

Q.   Tell us who you are.

A.   Lieutenant Eugene Neal.

Q.   All right.  And your employment is where?

A.   City of Jennings.

Q.   And you do what for the City of Jennings?

A.   I'm the lieutenant director of operations for the federal hold over.

Q.   All right.  And that's we're talking about in Jennings, Missouri?

A.   Yes.

Q.   Eastern half of Missouri, Eastern District of Missouri?

A.   Yes.

Q.   And you're the lieutenant over the Jennings hold over, and they hold federal inmates pending trial?

A.   Yes.

Q.   And you've been doing that for how long?

A.   I've been employed 21 years with Jennings.

Q.   Were you on duty May 20th, 2014?

A.   Yes, I was.

Q.   And your responsibilities are what?

A.   Overseeing the daily operations of the federal

1    jail, as well as the municipality jail.

2         Q.   And part of that is to maintain the safety of the

3    inmates as well as the safety of the staff?

4         A.   Yes.

5         Q.   And on May 20, 2014, you were working?

6         A.   Yes, I was.

7         Q.   In the two o'clock hour as you're working, were

8    you alerted to a fight?

9         A.   Yes, I was.  A transmission came over the radio

10   that we had a fight down in the day yard.

11        Q.   And in response to that radio dispatch what did

12   you do?

13        A.   I immediately got up from my office and ran

14   downstairs to the federal hold.

15        Q.   All right.  And when you went downstairs did you

16   go to the rec yard area?

17        A.   I did.  I met Sergeant Forti and them at the rec

18   yard.

19        Q.   And that is where the fight had occurred?

20        A.   It had occurred, yes.

21        Q.   All right.  And as you entered, you entered a

22   room as you went down --

23        A.   Yes.

24        Q.   -- down the stairs; is that right?  They call

25   that the day room?

1     A.   Yes, the day room.

2     Q.   Is it part of the rec yard?

3     A.   Yes.

4     Q.   And as you entered what did you see?

5     A.   Well, by the time I got there there was

6 physically actually at that time, no fighting.  Mr. Nailor

7 was standing against one wall, and then Mr. Rice and Mr.

8 Combs were standing over at the other side.

9     Q.   All right.  Now, when you say Mr. Combs, is that

10 Walter Combs?

11    A.   Yes.

12    Q.   Was he an inmate in the facility?

13    A.   Yes, he was.

14    Q.   And Nailor and Rice were also inmates?

15    A.   Yes.

16    Q.   Okay.  This Walter Combs that you speak of, is he

17 in the courtroom today?

18    A.   Yes, he is.

19    Q.   Can you point to him and tell the Court --

20    A.   Over at that table there.

21    Q.   Wearing a dark blue type outfit?

22    A.   Yes.

23     MR. JUDGE:  Judge may the --

24     THE COURT:  The record will show that the

25 lieutenant has identified Mr. Combs.

BY MR. JUDGE:

Q.   As you entered that room and you saw Nailor, did you notice anything unusual about him.

A.   I believe it was the right side of his face had some swelling to it.

Q.   And what did you do at that point?

A.   I pulled Nailor out of the yard and motioned to him to come up.  I took him to Post 2 which is our federal booking area.

Q.   Okay.  Post 2 is your federal booking area?

A.   Uh-huh.

Q.   Is what where he was brought?

A.   Yeah, that's where he was brought to.

Q.   And now when you say pulled him out of the yard, you mean physically pulled him or --

A.   No, I just motioned for him to step up.

Q.   All right.  Good enough.  And did you speak with Nailor in the Post 2 area, which is a booking area?

A.   Yes, I did.

Q.   And after you spoke to Kevin Nailor, what did you do next?

A.   After I spoke to Kevin Nailor and got what I could get from him, at that time then he was escorted back to his cell.

1    Q.   Okay.  All right.  And then who did you speak to

2    next?

3    A.   Then I went to my office to review the audio, the

4    tape, because we weren't a hundred percent sure who at that

5    point was also involved, and I reviewed that.  Took me

6    about ten minutes.

7    Q.   All right.  Nailor gave you some information as

8    to who was involved?

9    A.   Yes, he did.

10   Q.   All right.  Two people were involved?

11   A.   It was two involved.  All he gave me was the name

12   Big Country.

13   Q.   And you identified him as Rice?

14   A.   Yes.

15   Q.   Okay.  And you knew there was another inmate

16   involved?

17   A.   Yes.

18   Q.   All right.  You said audio, review the audio; do

19   you mean video?

20   A.   Video, yes.

21   Q.   And this fight was videotaped?

22   A.   Yes, it was.

23   Q.   And did you review the videotape?

24   A.   Yes, I did.

25   Q.   And could you identify the other person?

1     A.   Yes.

2     Q.   And you identified the other person involved in

3 the fight as --

4     A.   Inmate Combs.

5     Q.   All right.  And with that information what did

6 you do next?

7     A.   I came back down, and at that time I brought

8 Mr. Rice up and I had talked to him.  And he basically gave

9 me no information whatsoever, so he was sent to his cell.

10     Q.   Okay.  Then after you attempted to speak with

11 Mr. Rice, who did you talk to next?

12     A.   Then I brought up Mr. Combs.

13     Q.   All right.  And when you -- you did speak to

14 Mr. Combs; what did you ask him?

15     A.   I asked him what the fight was over.  And briefly

16 all he said was just a short sentence of -- he commented

17 they were on the same case and that he was a fucking snitch

18 and left it at that.

19     Q.   All right.  Was he -- well, let's ask this:  Did

20 you read him his Miranda rights before --

21     A.   Excuse me?

22     Q.   Did you read him his Miranda rights before you

23 asked him?

24     A.   No, I did not at that time, no.

25     Q.   What was the reason for not reading him his

1  rights?

2       A.   Well, for one, we weren't seeking prosecution or

3  anything.  I was just trying to figure out the

4  circumstances of the fight so I could act on it from there,

5  if I needed to separate them permanently, or how long I'd

6  lock them down for.  But if it was something we could

7  solve, if it was just a basic issue over commissary items,

8  a lot of times we can solve it and I can avoid lock down

9  time and other stuff.

10      Q.   Okay.  All right.  And basically you were

11 performing an administrative function?

12      A.   Yes.

13      Q.   To determine whether or not those three

14 individuals needed to be separated?

15      A.   Yes.

16      Q.   Is what you said, to determine if the fight was

17 over nothing, could it be resolved without separating

18 them?

19      A.   Yes.

20      Q.   And after you spoke with Mr. Combs, was he then

21 also brought to his cell?

22      A.   Yes.  He was escorted to his cell by Sergeant

23 Forti.

24      Q.   And as he's being escorted to his cell, what, if

25 anything, did he say?

1     A.   Sergeant Forti came back to me and stated that

2  inmate Combs had stated as he walked by David Ewing's cell

3  that he's a fucking snitch.

4     Q.   All right.  Walked by David Ewing's cell.  Is

5  David Ewing a federal inmate also?

6     A.   Yes, he is.

7     Q.   All right.  And as he walked by the cell,

8  Mr. Combs said to Ewing, basically, he's a snitch?

9     A.   Yes.

10     Q.   Referring to Nailor?

11     A.   Yes.

12     Q.   Your understanding is that was a spontaneous

13  statement by him and he wasn't being questioned?

14     A.   No, he wasn't being questioned, no.

15     Q.   Was -- we're going back to the day room when

16  you're bringing these people out.  Were any of these people

17  handcuffed at any time?

18     A.   No, no one is cuffed at any time.

19     Q.   Nailor was not cuffed when he was brought to --

20     A.   No.

21     Q.   -- To the Post 2 area?

22     A.   No.

23     Q.   Okay.  And he wasn't cuffed while in Post 2?

24     A.   No.

25     Q.   Rice, the same thing, he wasn't cuffed at any

1  time?

2      A.   No, he was not.

3      Q.   Was Mr. Combs, was he handcuffed at any time?

4      A.   No.

5      Q.   All right.  When you're talking to Mr. Combs in

6  the Post 2 area, were there a lot of police officers in a

7  room or was it just you?

8      A.   No, at that time it was myself, and I had

9  Sergeant Forti who was manned to keep an eye on the outside

10  rec yard.

11      Q.   So he was performing a dual function?

12      A.   Yes.

13      Q.   He was in the room but he was also keeping an eye

14  on the rec area?

15      A.   Yeah.

16      Q.   Because there was other prisoners down there?

17      A.   Yeah, we still had about fourteen inmates

18  downstairs.

19      Q.   All right.  Was there any coercion on your part

20  toward Mr. Combs --

21      A.   No.

22      Q.   -- At any time from the day room area up to the

23  Post 2 area which is the booking area.  When we say the

24  booking area, you're not bringing them up there to book

25  them for anything?

1      A.   No, that's just when new inmates come in, that's

2  where they're processed at.

3      Q.   All right.  But that's just a private area you

4  need to talk to -- in your opinion it wasn't wise to talk

5  to them in the midst of a bunch of people?

6      A.   No, normally if I have to deal with an inmate I

7  pull them out of the population.  And sometimes it's kind

8  of hard to deal with inmates when you got the other ones

9  standing around.

10     Q.   Okay.  Was Mr. Combs at any time during this

11 process from the day room area up to the Post 2 area, the

12 booking area, where you asked him a question and then when

13 he was brought to his cell, was he physically manhandled in

14 any way?

15     A.   No, he was not.

16     Q.   Was he struck in any way?

17     A.   No, he was not.

18     Q.   Was he yelled out by you guys?

19     A.   No, he was not.

20     Q.   Was he threatened in any way?

21     A.   No.

22     Q.   Threatened that he -- to be specific, threatened

23 that he better tell you what actually happened?

24     A.   No.

25     Q.   And did you have a gun on you --

1     A.   No, there were no firearms allowed down in that

2  area.

3     Q.   So you had no weapons displayed on him in any

4  way?

5     A.   No.

6     Q.   Was the atmosphere where you were questioning him

7  at, would you call it a hostile atmosphere or a calm

8  atmosphere?

9     A.   It was calm, I mean, neither party was being

10  hostile.  He was calm, I mean, I had no problem with him.

11     Q.   Okay.  The purpose of your question was an

12  administrative function?

13     A.   Yes.  I was trying to get to the bottom of what

14  the fight was over and what I could do to solve it.

15     Q.   Did you have any intention at all that he may be

16  prosecuted for this assault?

17     A.   No.

18     Q.   Did you have any intention to refer it for

19  prosecution?

20     A.   No.

21     Q.   You said that Mr. Rice didn't give you any

22  information, tell you anything?

23     A.   No.  Mr. Rice just basically --

24     Q.   Mr. Rice wasn't punished in any way, was he?

25     A.   He was sent to --

1     Q.   -- for not saying anything to you?

2     A.   No.  He was just sent to his cell and placed on

3  lock down as well.

4     Q.   All right.  So we're real clear for the record,

5  we're talking about two statements that Mr. Combs made,

6  that's the statement he made to you when you asked him a

7  question, and that was he basically said that they were on

8  the same case together and he's a snitch, you said what he

9  said, but that's essentially it.  And then the statement as

10  he was walking to -- being escorted to his cell, he made a

11  statement to David Ewing?

12     A.   Yes.

13        MR. JUDGE:  Judge, I don't have anything

14  further.

15        THE COURT:  Okay.  Mr. Welby.

16        MR. WELBY:  Thank you, Your Honor.

17

18                    CROSS-EXAMINATION

19  BY MR. WELBY:

20     Q.   Lieutenant Neal, you mentioned that you had no

21  intention of referring the case for prosecution?

22     A.   No, I didn't.

23     Q.   You prepared a report of the incident; is that

24  right?

25     A.   Yes, I did.

1    Q.   Did you send that to the federal authorities in

2  some manner?

3    A.   Yes, I was -- I was contacted to download the

4  video and to have a report sent with it.

5    Q.   All right.  At what point did you contact the

6  federal authorities?

7    A.   That same day, because that was the first time I

8  knew that those three individuals were on the same case

9  together.  And once I found out one was being considered a

10  snitch, I had to make sure I got them separated.  So I had

11  to call the U.S. Marshals -- that day I requested to have

12  inmate Nailor removed, but the next morning they removed

13  Mr. Combs and Mr. Rice.

14    Q.   Mr. Nailor also told you that they were on the

15  same case, right?

16    A.   Yes.

17    Q.   So you knew?

18    A.   No, Nailor, only name he'd give me was Big

19  Country.  Nailor would not -- he was not wanting to talk.

20  He just basically kept saying Big Country, which at that

21  time I had no clue who that was.

22    Q.   So the person Nailor identified as the person

23  that beat him up was Big Country?

24    A.   No, that's the only name he gave me was involved.

25  We knew there was two involved in it, I just -- the only

1    name he'd mention was Big Country.

2       Q.  Just so we're on the same page, Big Country is

3    not Walter Combs, right?

4       A.  No.

5       Q.  It's a different individual.  So he only mentions

6    one person being involved in the fight?

7       A.  Uh-huh.

8       Q.  And it was only upon your review of the videotape

9    that you learned that there were two people involved in the

10   fight?

11       A.  Yes -- well, no.  My officer who was at Post 2

12   who called out the fight, stated it that it was three

13   individuals in the yard fighting, but the third individual

14   at that time I still had no clue who was until I reviewed

15   the tape.

16       Q.  And then upon viewing the tape, you were able to

17   determine it was Mr. Combs?

18       A.  Yeah, I was able to determine.

19       Q.  You -- jumping back to the prosecution, have you

20   specifically requested that there be prosecution on this,

21   or you just didn't --

22       A.  No, I have not  --

23       Q.  -- Or you just did what the Federal Government

24   asked you to do?

25       A.  I just did what was requested of me.

1      Q.    Some of the reports indicate that there had been

2   multiple fights involving Nailor.  Is that --

3      A.    Yes, Nailor's had some issues in our facility.

4      Q.    Were any of those submitted for prosecution?

5      A.    No.

6      Q.    And do you have any reason to think that

7   Mr. Combs was involved in any of the other five fights

8   involving Mr. Nailor?

9      A.    No.  The other fights with Nailor weren't

10  involved with Combs.

11     Q.    So this was Nailor's sixth fight while he was

12  incarcerated?

13     A.    Somewhere about that, yes.

14     Q.    You indicated that you were in your office at the

15  time the incident occurred; is that right?

16     A.    Yes.

17     Q.    And then you got up and immediately went to the

18  day room?

19     A.    Downstairs, yes.

20     Q.    You previously testified you did not have a

21  firearm with you?

22     A.    No.

23     Q.    Did any of the other guards have firearms?

24     A.    No, there's no firearms allowed down in that area

25  at all.

1     Q.   And you didn't see anybody with a firearm?

2     A.   No, nobody had a firearm.

3     Q.   You mentioned Sergeant Forti and "them."  Do you

4  remember who else was there?

5     A.   Officer Taylor who was the officer in the control

6  area there, he was still in the control area.  And then

7  shortly after me and Sergeant Forti got there, Officer

8  Spencer came down to stand between the door and also keep

9  an eye on the day yard.

10    Q.   One of the reports mentions an officer, C.O.

11  Goad?

12    A.   Officer Goad.

13    Q.   Goad, perhaps, yes, G-O-A-D.  Did you see him

14  there?

15    A.   She came down.  She was down there just a brief,

16  then went right back up.  I had actually sent her back up

17  stairs because I had nobody at initial booking, and I

18  needed her back up there.

19    Q.   Did you see any other guards at the scene?

20    A.   No.

21    Q.   Now how many of those -- so that's five total

22  that had some involvement in the case?

23    A.   I would say more, four, like I said Officer Goad

24  was sent back upstairs.

25    Q.   All right.  Just to eliminate, Officer Goad has

1    nothing to do with the questioning of Mr. Walter Combs.

2        A.    Okay.  Then Officer Spencer came down after

3    pretty much after I had already started the questioning.

4    And Officer Taylor was behind the glass still monitoring

5    the cameras.

6        Q.    All right.  Was he within the range of sight of

7    Mr. Combs when he was behind the glass?

8        A.    No.

9        Q.    So the only people in the room are you --

10        A.    The only ones physically standing there with

11    Combs would have been myself and Sergeant Forti.

12        Q.    So it's you, Sergeant Forti, and Mr. Combs was by

13    himself at the time he was questioned?

14        A.    Yes.

15        Q.    You mentioned at some point in time Mr. Rice was

16    there, but he was later --

17        A.    Yeah, I brought them up each one a at a time.  I

18    didn't bring them all three up at one time.

19        Q.    When you say you brought them up, from where?

20        A.    From the day yard that they were in.

21        Q.    Okay.  You indicated that it took you about ten

22    minutes to review the video of what had happened?

23        A.    About that, about ten minutes.

24        Q.    Was Mr. Combs detained during that time --

25        A.    No, he was still in the day yard.

1    Q.   He was simply left in --

2    A.   Yeah.  Nailor had already been placed on lock

3  down in his cell, and I went upstairs to view the tape so I

4  could be sure which, you know, individuals I was bringing

5  back up to talk to.  And after my view of the tape I came

6  back down, and that's when I brought Rice up, then I

7  brought Mr. Combs up.

8    Q.   You brought them up together or separate?

9    A.   No, I brought them up individually.

10    Q.   You say they were ordered up?

11    A.   Yeah, I just looked in the door and said, you,

12  come on up, and then, you know.

13    Q.   So would you agree with me it wasn't an incident

14  where Mr. Combs voluntarily came to you and said I'd like

15  to talk to you about what happened?

16    A.   No.

17    Q.   He was there on a direct order from the

18  lieutenant in charge --

19    A.   Yeah.

20    Q.   So he was there responding to your direct

21  order?

22    A.   Yes.

23    Q.   He had no choice but to be in that location at

24  that point in time?

25    A.   Yeah, because I was requesting his presence at

1  Post 2.

2      Q.   You describe this Post 2 as a booking area?

3      A.   Yes.

4      Q.   Is that an area where Mr. Combs would typically

5  be on a normal day while he was in jail?

6      A.   No, that area is off limits to inmates unless

7  they are called there by staff.

8      Q.   So he was in a place that he only could be there

9  because you ordered him to be there?

10     A.   Yes.

11     Q.   Can you tell us how big of a room it is?

12     A.   About the size area the Judge is sitting in.

13  It's got glass, and behind the thing there's, you know, the

14  monitors that the officers watch.

15     Q.   The room itself, if you can give us an idea in

16  feet just for the record?

17     A.   Feet, I would say maybe six foot wide to maybe

18  eight feet deep.

19     Q.   Is it an open area or is it enclosed?

20     A.   It's enclosed.

21     Q.   And was -- there's one door that goes in or more

22  than one?

23     A.   There's one door that comes in from the outside

24  coming in from the municipal side of the jail, and then

25  there's the other door that goes back into federal

1  population.

2        Q.   So there are two doors.  Were they both closed

3  during the interview?

4        A.   Yes.  Well, the one door to federal population

5  was open because that's where Officer Spencer came in and

6  stationed himself at was there in that doorway.

7        Q.   So the door was open but there was an officer

8  standing in the doorway?

9        A.   Yes.

10       Q.   So there's one officer blocking the door to the

11  federal area, and the other area to the municipal doors are

12  closed?

13       A.   It was secured, yes.

14       Q.   And inside the ten by six, is that what you --

15       A.   Yes, the control room was Officer Taylor.

16       Q.   So there's one guy blocking the door, you and

17  Sergeant Forti, and then Mr. Combs all inside the area?

18       A.   Yes.

19       Q.   All right.  And he was there pursuant to your

20  order?

21       A.   Yes.

22       Q.   And you were in uniform I assume?

23       A.   Yes.

24       Q.   Obviously you were a law enforcement officer, he

25  knew that you were the lieutenant, knew you were in

1   charge?

2      A.   Mr. Combs knows who I am, yes.

3      Q.   All right.  And he had been at your facility for

4   several months; is that right?

5      A.   Yeah.

6      Q.   And you knew he had been under a federal

7   indictment or he was there as a federal detainee?

8      A.   Yeah, I knew he was there on a federal

9   indictment, yes.

10      Q.   So you knew he had been indicted?

11      A.   Yes.

12      Q.   And did you know that he also had an attorney?

13      A.   I presume; most of them have attorneys.  I mean,

14   I don't get involved in their cases whatsoever.  The way I

15   look at it, their case is between themselves and the U.S.

16   Government.  All I do is house them.

17      Q.   But as a lieutenant in the Jennings Police

18   Department, you would know that someone that's under a

19   federal indictment has an attorney?

20      A.   Most of them, yes.

21      Q.   And when the attorneys come and visit you make

22   them sign a book --

23      A.   Yes, they sign in and we take them down.

24      Q.   And that book was available to you if you needed

25   to find out --

1      A.   Yes.

2      Q.   -- Who Mr. Combs' attorney was, you could have

3 just looked in the book?

4      A.   Yeah.

5      Q.   All right.  Did you make any effort to contact me

6 or any other attorney?

7      A.   No.  I normally don't contact attorneys when

8 inmates get in a brawl with another inmate.  I've never

9 seen any reason why I had to contact that inmate's

10 attorney.

11     Q.   And in Mr. Combs' particular case on May 20, you

12 did not contact his attorney or make any effort to?

13     A.   No, I contacted the U.S. Marshals to request one

14 of them be moved.

15     Q.   You indicated there were no firearms.  When you

16 ran down to the room did you bring any other type of

17 weapons, a billy club or any other type of --

18     A.   On my duty belt I'm sure I had my Taser on and my

19 asp, but nothing was drawn.

20     Q.   All right.  What about the other guards in the

21 rooms?

22     A.   The only one that would have had an asp or Taser

23 on would have been the Sergeant.

24     Q.   So you and the Sergeant both had Tasers but no

25 firearms?

1     A.   Yes.

2     Q.   And did the Sergeant ever display his Taser?

3     A.   No.

4     Q.   And you said C.O. Spencer was in the door.  Did

5 he ever display a weapon?

6     A.   No, he has nothing assigned to him.

7     Q.   He may not have any type of weapon?

8     A.   It's mainly the supervisors.

9     Q.   Other than Taser, did you have any other type of

10 weapons on your person?

11    A.   No.

12    Q.   Did Sergeant Forti have any weapons on his person

13 other than the Taser?

14    A.   No.

15    Q.   You testified that you did not advise Mr. Combs

16 of his Miranda rights before questioning him?

17    A.   No, I did not.

18    Q.   You indicated he was not handcuffed; is that

19 correct?

20    A.   No, he was not.

21    Q.   Was he free to just get up and walk out of the

22 room?

23    A.   All he had to do was just say like Rice did, Rice

24 refused to answer and I said, okay, you're on lock down and

25 I had him escorted to his cell.

1    Q.    Prior to being questioned, was he free to just

2  get up and walk away?  Could he just walk out?

3    A.    If he wasn't going to answer questions, I'd have

4  done like I did with Rice, I would have sent him to his

5  cell, placed him on lock down, and I still would have

6  called and request the movement of one of the inmates being

7  moved.

8    Q.    Did you tell him that he could just get up and

9  walk away?

10    A.    No, I did not.

11    Q.    Did you tell him that he didn't have to answer

12  any of your questions?

13    A.    No, I did not.

14    Q.    And you're familiar with the Miranda rights?

15    A.    Yes, I am.

16    Q.    Did you advise him of any of the rights that

17  would be required by Miranda?

18    A.    Yes.

19    Q.    You did advise him of other rights?

20    A.    No, I didn't advise him.  My whole purpose of

21  questioning him was basically to get to the bottom of what

22  happened for my safety, my staff's safety, as well as the

23  safety of the inmates, and find out if I can resolve the

24  problem.  And if I was able to resolve it, I had resolved

25  it.  But at that time when it was made apparent that there

1    was more of an issue here with the three, that's when they

2    were all placed on lock down and the request for movement

3    was made to the Marshals.

4        Q.   Just so we're clear, you didn't advise him that

5    he had a right to remain silent?

6        A.   No, I did not.

7        Q.   You didn't advise him he had a right to have an

8    attorney?

9        A.   No, I did not.

10       Q.   You didn't advise him that he had a right to have

11   one appointed for him if he couldn't afford one?

12       A.   No.

13       Q.   You didn't advise him that he could stop

14   questioning at any point if he chose to do so?

15       A.   No.

16       Q.   Or anything else that the Miranda decision would

17   require?

18       A.   No.

19       Q.   You described the room briefly.  Can you describe

20   the lighting conditions in that room?

21       A.   It was a little bit brighter than what it is in

22   here right now.

23       Q.   So normal electric light?

24       A.   Yes.

25       Q.   Do you know what specific language was used when

1  he was ordered up?  Do you know what was -- were you the

2  one that told him to come up or was somebody else --

3      A.   I actually appointed Officer Spencer, I said have

4  Mr. Combs come up.  And he had popped the door and he just

5  said "Combs" and motioned him up.

6      Q.   So he just ordered him directly, there was no

7  other --

8      A.   Yeah, when he stepped up he pointed him into my

9  direction in the area I was at.

10     Q.   The question you described before, it was a

11 direct question you put to Mr. Combs as part of your

12 investigation of the incident?

13     A.   Yeah, I just basically asked him what was the

14 problem and what was going on, and that was probably the

15 extent of it.

16     Q.   And during the questioning, was that the only

17 thing that he said?

18     A.   Yes, that was -- that's all he said, and then he

19 just kind of looked at the floor and I just went, you know,

20 at that point I had him sent to his cell.

21     Q.   There were no further questions that you asked

22 him?

23     A.   I had no further questions for him, no.

24     Q.   Did any of the other officers ask questions?

25     A.   No.

1    Q.    You described an incident that was reported to

2 you by Sergeant Forti occurring in, I guess, the hallway or

3 something when he was walking back?

4    A.    It was going back to the cell block area.  They

5 were passing the cells going back to Mr. Combs' cell when

6 apparently, what I was told, he had stopped there at Mr.

7 Ewing's cell and just said he's a snitch.  And Forti moved

8 him on and continued to escort him to his cell.

9    Q.    And you only know that because somebody else told

10 you that?

11    A.    Yes.

12    Q.    So you don't know what the conditions were at the

13 time that he made those statements?

14    A.    No.

15    Q.    You don't know if Sergeant Forti had asked

16 questions or --

17    A.    No, I don't.

18    Q.    Or abused him in any way in order to get him to

19 make a statement to that effect?

20    A.    No.

21    Q.    So it was reported to you that it was a statement

22 that Mr. Combs made to another inmate as opposed to

23 Sergeant Forti?

24    A.    Yeah, it was brought to me that he made the

25 statement to another inmate.

1      Q.   So Sergeant Forti didn't tell you whether or not

2  he had questioned him?

3      A.   No.

4      Q.   And you have no other information about the

5  circumstances of that statement other than you've conveyed

6  here today?

7      A.   No.

8      Q.   Sergeant Forti would have to tell us about it?

9      A.   Yes.

10          MR. WELBY:  All right.  I don't have any further

11  questions, Your Honor.

12          THE COURT:  Mr. Judge?

13

14                    REDIRECT EXAMINATION

15  BY MR. JUDGE:

16      Q.   I think we got a little confused on the timing

17  here.  Talking about Sergeant Forti, you know now after

18  talking to Sergeant Forti that Forti did not ask him any

19  questions?

20      A.   Yeah, since I've talked to Sergeant Forti, yes.

21  He said all he was doing was just walking him to the

22  cell.

23      Q.   And that, Forti also told you that Combs stopped

24  on his own?

25      A.   Yes.

1    Q.   To talk to Ewing?

2    A.   Yes.

3    Q.   Forti actually wanted to convey him to the cell

4    but Combs is the one who stopped on his own?

5    A.   Yes.

6    Q.   You heard also Forti didn't -- he told you he

7    didn't question him?  Didn't have any weapons drawn?

8    A.   Yes.

9    Q.   Is that fair to say?

10   A.   That's fair to say, yes.

11   Q.   All right.  The -- you did not question Mr. Combs

12   about his underlying federal case?

13   A.   No, as far as I'm concerned, that's really none

14   of my business.

15   Q.   When he was ordered to come up, was he screamed

16   at or was he just told --

17   A.   He was just told to come up.

18   Q.   All right.  When I asked you about any weapons

19   drawn or guns drawn, that applied to Sergeant Forti also;

20   he didn't have any weapons --

21   A.   Nobody had any guns drawn.

22   Q.   In fact, he didn't even have a gun?

23   A.   No.

24   Q.   All right.

25        MR. JUDGE:  Judge, I don't have anything else.

1    THE COURT:  Okay.  Mr. Welby, anything further?

2         MR. WELBY:  Nothing further, Your Honor.

3         THE COURT:  Okay.  Thank you, Lieutenant.  You

4    may be excused.

5         Did you have anything further you're going to

6    present, Mr. Judge, Mr. Welby?

7         MR. WELBY:  Nothing further, Your Honor.

8         THE COURT:  Okay.  Now, just as far as Sergeant

9    Forti's statement are concerned, Mr. Judge, your position

10   is as to necessity, what he has to say that he alleges

11   Mr. Combs said.  You're saying that the record is

12   sufficient enough here?

13        MR. JUDGE:  I believe so, Judge.  I think hearsay

14   is allowed.

15        THE COURT:  Okay.  Mr. Welby?

16        MR. WELBY:  Your Honor, it would be my argument

17   that there's insufficient evidence as to the voluntariness

18   of that statement that everything was presented here by

19   hearsay.

20        THE COURT:  I think he's made at least a

21   colorable case to make those findings based on the

22   questions that were asked and answered.  They may be

23   hearsay.  If you want to do something differently I would

24   give you the opportunity to call Sergeant Forti if you want

25   to do that, Mr. Welby, but I'll let you decide that.

1          MR. WELBY:  I believe he's here.  And I ask just

2   to make a record, I would call Sergeant Forti, with the

3   Court's permission.

4

5                          TODD FORTI,

6   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

7   FOLLOWS:

8                      DIRECT EXAMINATION

9

10         THE COURT:  As to the hearsay statement, go

11  ahead.

12         MR. WELBY:  Thank you Your Honor.

13  BY MR. WELBY:

14     Q.   Could you please state your name for the record.

15     A.   Sergeant Todd Forti.

16     Q.   Is that F-O-R-T-I?

17     A.   Yes, sir.

18     Q.   You're a Sergeant with the Jennings Police

19  Department?

20     A.   Jennings Corrections, sir.

21     Q.   Jennings Corrections, all right.  Were you on

22  duty on May 20th, 2014, at roughly 2:00 in the afternoon?

23     A.   Yes, sir.

24     Q.   Did you on that occasion have an opportunity to

25  have an encounter with Mr. Walter Combs?

1       A.      Yes, sir.

2       Q.      Can you describe how that began?

3       A.      We were called down.  We had a radio call that

4    there was a fight.  We got downstairs and everybody was

5    separated.  Lieutenant Neal did most of the questioning.  I

6    was just kind of watching the crowd, making sure -- I think

7    it was probably about, there's probably about 14, 15 people

8    downstairs that we had to keep an eye on.

9       Q.      Most of the questioning, can you tell me what

10   that means when you say most of the questioning?

11      A.      He wanted to sort out what happened and kind of

12   get an idea of what we had to do next for security

13   purposes.

14      Q.      Did he ask Mr. Combs any question at any point in

15   time that day?

16      A.      I believe he did.

17      Q.      When did that happen?

18      A.      You mean like -- he was brought upstairs to be

19   asked.

20      Q.      Did you ask Mr. Combs any questions that day?

21      A.      No, sir.

22      Q.      Did you observe Lieutenant Neal ask Mr. Combs

23   questions that day?

24      A.      Yes, sir.

25      Q.      When you say he asked questions, how many

1  questions did he ask him?

2      A.  I'm not sure.

3      Q.  Were you present during the questioning?

4      A.  I was in the room but I was kind of keeping an

5  eye on what was going on with the crowd downstairs.

6      Q.  What room were you in?

7      A.  It's called Post 2.  It's a small little -- it's

8  a small little security area.  It has a booth.

9      Q.  And then after -- you're in that little booth

10  with you and Mr. Combs?

11      A.  He would be like in a hallway.  He would have

12  been in a hallway area.

13      Q.  Mr. Combs would have been in a hallway area?

14      A.  Yes, sir.

15      Q.  So the questioning took place in a hallway?

16      A.  Correct.

17      Q.  And where was the hallway?

18      A.  It would be easier with a diagram.  It's like an

19  L-shaped area.  I believe that he was asking him right

20  under, right around a window area that would have been to

21  my right, and I was about five feet from him, but then I

22  also walked another ten feet and checked out the area

23  below.

24      Q.  So from your vantage point you can see the day

25  room below?

1    A.   Uh-huh.

2    Q.   And then Post 2 is a separate room, or is that

3  what you call the hallway?

4    A.   Post 2 is considered a separate area of the day

5  room, but it has a hallway in it, and that would be where

6  Lieutenant Neal was asking questions.

7    Q.   In the hallway?

8    A.   Correct, sir.

9    Q.   Okay.  And you were in the hallway while this

10  questioning was going on?

11    A.   Yes, sir.

12    Q.   Did you have a Taser or any other type of weapons

13  on you?

14    A.   I had a Taser on me.

15    Q.   Did you ever display it or make any threatening

16  gestures toward him?

17    A.   I don't -- after -- I don't really recall, but if

18  I would have had it out it would have been when I was in

19  the lower rec yard.

20    Q.   Your report indicates that in addition to

21  yourself and Lieutenant Neal that C.O.s Taylor, Spencer,

22  and Goad were there?

23    A.   Yes, sir.

24    Q.   Were they all there during the questioning?

25    A.   I don't believe so.  I think they were -- they

1    were probably doing what I was doing which was keeping an

2    eye on the lower rec yard.

3         Q.    So they were present in the area but not

4    participating in the questioning?

5         A.    Yes, sir.

6         Q.    Did you hear the questions that the lieutenant

7    asked Mr. Combs?

8         A.    Maybe, maybe I caught some of the conversation,

9    but I wasn't paying attention.

10         Q.    Do you know what Mr. Combs said during that

11   questioning?

12         A.    Just from what Lieutenant Neal had told me.

13         Q.    Just what somebody else had told you but --

14         A.    Correct.

15         Q.    As you were there that day, you didn't really

16   know what the question was or what the answers were?

17         A.    No, sir.

18         Q.    So you don't know what was said during that part

19   of the interview?

20         A.    Well, I mean I know what Lieutenant Neal was

21   looking for.

22         Q.    Based on your firsthand knowledge, you don't

23   remember what the questions or answers were at that point

24   in time?

25         A.    No, sir.

 1      Q.   At some point in time, does someone escort

 2  Mr. Combs out of that hallway?

 3      A.   Yes.  I did.

 4      Q.   Where did you go?

 5      A.   We headed into another hallway which leads to

 6  main population.

 7      Q.   During that -- I'm just going to call it an

 8  event, I'm not saying it's a big event -- but during that

 9  walking period, was it just you and Mr. Combs?

10      A.   Officer Spencer had to have been behind me.

11      Q.   So it would have been two officers?

12      A.   Correct.  He's a big guy, he was about five, ten

13  feet behind me.

14      Q.   Did any law enforcement officers ask Mr. Combs

15  any questions while you were walking through those two

16  hallways?

17      A.   No, sir.

18      Q.   Did you say anything to Mr. Combs at all?

19      A.   I'm sure I just said we're heading back to cell

20  ten.

21      Q.   And that's Mr. Combs' cell?

22      A.   Correct.

23      Q.   Did Officer Spencer say anything that you can

24  recall?

25      A.   Not that I can recall.

1     Q.   And did you hear Mr. Combs say anything while he

2  was walking down that hallway?

3     A.   He stopped at cell twenty, and he said he's

4  snitching.

5     Q.   And that's all he said?

6     A.   That's all he said.

7     Q.   He's snitching.  Okay.  Prior to making that

8  statement, had there been any contact, any threats, any

9  pressure from the law enforcement officers on Mr. Combs

10  during that event of walking down the hallway?

11     A.   No, sir.

12     Q.   Do you recall if there was any other statements

13  made by Mr. Combs at that point in time that you can recall

14  hearing?

15     A.   No, I can't recall any.

16         MR. WELBY:  Your Honor, I don't have any further

17  questions.

18         THE COURT:  Do you have anything at all

19  Mr. Judge?

20         MR. JUDGE:  I think just -- well --

21

22                 CROSS-EXAMINATION

23  BY MR. JUDGE:

24     Q.   Mr. Combs, was in the Post 2 area when he was

25  talked to by Lieutenant Neal?

1    A.    Yes, sir.

2         MR. JUDGE:  Judge, I don't have anything else.

3         THE COURT:  All right.  Anything further?

4         MR. WELBY:  Nothing further.

5         THE COURT:  Thank you very much, Sergeant Forti.

6    You may be excused.  You don't have anything further,

7    Mr. Judge, correct?

8         MR. JUDGE:  No, Judge.

9         THE COURT:  Then I'll take this under submission.

10   Just for your planning purposes, Mr. Welby, obviously this

11   last statement is a volunteered statement and I can't think

12   of any reason why I would want to suppress it.  And as far

13   as the other statements are concerned, I'll look at the

14   cases that you have both cited, now, however, would appear

15   to be an administrative type questioning for the security

16   of the institution, therefore may well be admissible.  What

17   I'm going to do is I'm going to ask for a transcript of

18   this proceeding so I can look at it and check to make

19   sure -- you are retained or appointed?

20        MR. WELBY:  I'm appointed on this case, Your

21   Honor, and I would be happy to request a transcript.

22        THE COURT:  Why don't you do that if you would,

23   please.  You'll need it anyway I would guess.  At any rate,

24   that's what we'll do.  Anything further you'd like?

25        MR. JUDGE:  Judge, I don't have anything

1   further.

2           THE COURT:  Or Mr. Welby?

3           MR. WELBY:  I'll submit that right away, Your

4   Honor.

5           THE COURT:  Thank you.  We will be in recess

6   then.  Thank you all.

7               (COURT ADJOURNED.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       REPORTER'S CERTIFICATE

2

3              I, Patti Dunn Wecke, Registered Merit Reporter,

4       hereby certify that I am a duly appointed official court

5       reporter of the United States District Court for the

6       Eastern District of Missouri.

7              This transcript was prepared from an electronic

8       recording of proceedings of which I was not physically

9       present.  Therefore, I certify that the foregoing

10      transcript is true and accurate as heard and understood

11      from the recording and was transcribed to the best of my

12      ability.

13             I further certify that this transcript containing

14      pages 1 - 41 inclusive, was delivered electronically, and

15      that this reporter takes no responsibility for missing or

16      altered pages of this transcript when same transcript is

17      copied by any party other than this reporter.

18             Dated this 22nd day of August, 2014.

19

20                      /s/Patti Dunn Wecke, RMR, CRR, CMRS

21                      Official Court Reporter

22

23

24

25